## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT
## AND SEARCH WARRANTS

I, Sean Rafferty, being a duly sworn and appointed Special Agent of the United States Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), formerly known as the Immigration and Naturalization Service (INS) and the United States Customs Service (USCS), hereby make the following statement:

1. I am currently employed as a Special Agent with ICE and have been so employed since December 2002. I have had training and experience in the enforcement of the Immigration and Nationality laws of the United States and am fully familiar with the statutes applicable to false document production, possession and transfer as well as false claims to United States citizenship. I am also familiar with the law regarding false impersonation of a federal agent.

2. The affidavit is based upon my own investigation and information provided to me by other law enforcement agents and agencies. This affidavit is not intended to contain all information I have learned during the course of this investigation but that which is sufficient to support a finding of probable cause in support of a criminal complaint charging Francisco Soares and Paul Stein with violations of Title 18, United States Code, Section 912 (false impersonation of a federal officer), Title 18, United States Code, Section 371 (conspiracy to violate federal law, i.e., to falsely impersonate a federal officer) and in support of applications to search Soares' residence, his car and Stein's garage .

### Legal Theory

3. I understand that proof of false impersonation of a federal officer involves three essential elements:

1

i. The defendant pretended to be a federal officer or agent;

ii. Such pretense was false and the defendant knew it was false; and

iii. The defendant, while so pretending, demanded or obtained something of value, in this case money.[1]

In addition, proof of conspiracy involves showing an agreement to commit a crime, in this case the crime of false impersonation of a federal officer, and at least one overt act taken in furtherance thereof.

### Overview of the Conduct

4. This investigation involves a scheme by targets Soares and Stein, posing as an ICE agent and an FBI agent, respectively, to defraud persons seeking to obtain permission to stay in the United States despite their lack of a visa, residency status or other legal basis for staying. Soares and Stein promised to clear up any immigration "issues" and obtain legal permanent resident status (i.e., get a green card) for their victims. Defendants charged between $8,250 and $10,750 for their promised results.

5. As I describe in detail below, the investigation includes telephone calls (recorded and unrecorded) and face-to-face meetings between the targets, Soares and Stein, and three "customers" of the targets. One customer is identified herein as "Cooperating Witness 1." A second customer is identified as "Confidential Informant 1." A third customer is a federal agent acting in an undercover capacity; he is identified as either the "UC" or by his name.

---

[1] " Whoever falsely assumes or pretends to be an officer or employee acting under the authority of the United States or any department, agency or officer thereof, and acts as such, or in such pretended character demands or obtains any money, paper, document, or thing of value, shall be fined under this title or imprisoned not more than three years, or both." 18 U.S.C. § 912.

## Cooperating Witness 1

6. On March 5, 2014, myself and another Special Agent from Homeland Security Investigations ("HSI") interviewed a woman who said she is a citizen of Brazil but here in the United States illegally. Also present at the interview were the woman's husband and her attorney.

## Cooperating Witness 1 Meets Francisco Soares

7. According to this woman, to whom I will refer as "Cooperating Witness 1" ("CW-1"), she entered the United States without inspection by crossing the U.S.-Mexico border. She was caught by the United States Border Patrol and placed in removal proceedings. She was ordered removed by an Immigration Judge but remained here illegally. She later married a U.S. citizen and gave birth to a child here.

8. According to CW-1, she heard about Francisco Soares from a friend of hers. She was told that Soares was an Immigration Officer who could erase a person's immigration arrest record and provide lawful permanent resident ("LPR") status for a fee. In October of 2011, CW-1 met with Soares, who told her he is an Immigration Officer employed by ICE.

## Soares Promised to Fix CW-1's Immigration Problems

9. During this initial meeting, Soares told CW-1 that he had the ability to "erase" her immigration arrest record for a fee of $2,500 and that for a total fee of $10,500 he could erase her arrest record and obtain LPR status for her. Soares told CW-1 that he would need copies of her passport, additional passport-type photographs of her and a copy of her marriage certificate. CW-1 agreed to use Soares' services and paid him $2,500 at the first meeting by check. I have seen a copy of the canceled check drawn on

3

CW-1's bank account and made payable to Francisco Soares in the amount of $2,500. Soares told CW-1 that it would take a year to eighteen months to get everything done.

10. In December of 2011, CW-1 met again with Soares. He told her that everything was set for erasing her immigration record and that he needed additional documents for the LPR status, including wedding photographs, her marriage certificate and a letter to the Immigration Judge from her husband regarding the hardship he would face if CW-1 was deported. Soares also demanded payment of an additional $4,000. In a subsequent meeting that month, CW-1 and her husband paid Soares $4,000 by Bank of America check. I have seen a copy of the canceled check made payable to Francisco Soares in that amount. I have also shown CW-1 and her husband a photograph of Francisco Soares taken from his Registry of Motor Vehicles file; they indicated that this was the person with whom they met. CW-1 had told me that Soares drives a silver Mercedes SUV; I confirmed that Soares is the registered owner of a gray 2004 Mercedes ML350, a sports utility-type vehicle.

## Soares Introduces Paul Stein, A Purported FBI Agent

11. During the following two years, CW-1 contacted Soares from time to time to see what progress had been made in getting her LPR status. Soares generally made excuses as to why it was still incomplete. At some point, he told her things were getting close but that she needed to meet with an associate of his from the Federal Bureau of Investigation ("FBI") to be fingerprinted.

12. Around February of 2013, Soares directed CW-1 to meet him at the Shaw's Supermarket parking lot in South Boston. From there, Soares drove her to a FedEx store and introduced her to a man who appeared to work there. On the way to the FedEx

4

store, Soares told CW-1 that the person they were going to see was an FBI agent who was assigned to the FedEx store as part of an investigation to find drugs and money in FedEx packages.  After meeting this man, CW-1 described him as a slender white male, balding with white hair and in his late fifties.  She said he was about six feet tall and spoke English.[2]  We have subsequently identified this individual as Paul Stein (see paragraphs 14 & 15 below). CW-1 stated during the meeting Soares and Stein were talking and Soares asked Stein if he had found anything. Stein stated he found stuff here and there. CW-1 stated Stein and Soares were talking about packages containing drugs and money. CW-1 stated she paid Stein $50 U.S. dollars and Stein fingerprinted her, took a copy of her passport and had her sign certain documents.

13.  On January 18, 2014, CW-1 met with Soares.  He told her that she needed to have her fingerprints redone.  Soares directed CW-1 to the Comfort Inn in Foxborough, Massachusetts.  She was told to come to the back door of the motel.  Soares met her there and led her to a room in the motel; CW-1 thought it was number "140 something."  The slender white male (Stein) was inside the room with a young female.  Soares told her again that this man was an FBI agent who worked catching people sending money and drugs to other countries.  CW-1 inquired again about the progress of her immigration status but Soares offered excuses.  Soares wanted another $2,000 after the fingerprints were done but CW-1 said she would only pay the remaining amount ($4,000) when everything was done and her LPR status was approved.

14.  On March 14 and 24, 2014, I interviewed the general manager ("ABC ") of the Comfort Inn in a town in the greater Boston area (the location CW-1 went to for her

---

[2] CW-1 and Soares communicate in Portuguese.

second set of fingerprints). ABC did not have any record of Soares having rented rooms at his hotel, but when I explained the nature of the investigation ABC stated he thought a motel customer named Paul Stein might be involved. Stein had rented room 143 from January 16, 2014 to January 21, 2014. According to ABC, Stein frequently requests to rent room 143 at the hotel. Stein had told ABC that Stein works for the FBI doing fingerprinting. Stein also said that there would be people coming in and out of his room. Stein did not show ABC a badge. ABC said that Stein drives a silver Infinity.

15. I ran Stein's name through the RMV database and determined that a person named Paul Stein, with a home address of 6 Beacon Court, Mashpee, Massachusetts, is the registered owner of a silver Infinity model G37X, registration number 73495. ABC recalled that Stein used the Mashpee address in registering at the hotel.

16. I sent, by attachment to a text message, a copy of the RMV photograph of Paul Stein to CW-1. I then called to see if she recognized the person depicted. She told me that it was the person who had fingerprinted her on two occasions.

17. At 8:47 pm on March 14, 2014, I received a call from ABC informing me that Stein had just checked into the Comfort Inn for a one-night stay. ABC told me his hotel clerk "HJ" observed Stein's car to be a silver Infinity G37X with registration number 73495. I asked ABC if the hotel had a security video system; he said it did.

18. On March 22, 2014, ABC informed me that Stein had again checked into his hotel. Two days later, I made personal observations on March 24, 2014 of Stein's silver Infinity, Massachusetts license plate 73495, parked in the lot outside the motel. I saw Stein exit the motel entrance at approximately 11:40 a.m., accompanied by a female.

19. I discussed Stein further with ABC on March 24, 2014. He told me that Stein had told ABC that Stein worked for the FBI. ABC has observed a female staying with Stein in the hotel room. After one of Stein's stays, I went through the trash in the room rented by Stein and found an empty box of condoms and what appeared to be a pipe used to smoke crack cocaine. I also observed, on the surveillance video, two men go into the room rented by Stein, one at a time late at night. I later determined there were advertisements on backpage.com bearing a photograph of the woman I saw accompanying Stein and listing her as an escort.

20. One of the night managers for the motel, "DE," stated said that she had seen Stein sitting in his car alone for hours at a time during the night at a time when he had rented a room at the Comfort Inn. Another hotel employee, FG, described two females she saw with Stein on different occasions as "beaten up" or rough looking, as if they had drug habits. FG told me Stein told her that he worked for the FBI as a fingerprint specialist. FG also confirmed that Stein frequently requests room 143, which is near the back of the motel. Both FG and ABC have observed two different types of clients; single men and couples or families.

21. It appears likely that Stein is using the motel rooms he rents for two purposes. One is prostitution and the other is pretending to be an FBI fingerprint specialist in support of the scheme with Soares to get money to clean up immigration status issues for persons present in this country without authorization. This explains why different types of people have been observed meeting with Stein, Soares and/or whatever woman is with Stein.

**Soares Bolsters His Claim to Be an Agent**

22. In addition to telling CW-1 that he was an immigration agent, Soares made a number of statements in telephone calls and texts that appear intended to give the impression that he is a federal agent. For example, on March 25, 2014, Soares told CW-1 that he would not be available by telephone at 8:00 a.m. because "he would be in court then." In a text message sent on February 15, 2013, he wrote "I'm in court with 2 people who got arrested I'll call you soon." By text message sent on December 6, 2013, Soares told CW-1 that "we talked to VISACENTER yesterday we're waiting for the A #..." He also told CW-1 on the telephone that he was working on cleaning up her immigration problem and that the progress he was making towards getting her a LPR [green] card. They also discussed the remaining payments owed by CW-1 for getting her LPR card. Soares and CW-1 also discussed that Soares could help do the "cleaning" for two of CW-1's friends who have immigration issues. Soares said that if CW-1 trusts them, she could give the friends Soares' telephone number.

### A Second Customer of Soares

23. A second person, who is a confidential informant ("CI-1"), then called Soares at the number provided by CW-1 in a consensually-recorded telephone call.[3] I have reviewed the English translation of this and all other recorded telephone calls and texts translated from Portuguese to English by a translator employed by U.S. Citizenship and Immigration Services' Language Services Section. On this first call between CI-1 and Soares, CI-1 said he was one of the two friends to whom CW-1 had been referring. CI-1

_____

[3] CI-1 has provided accurate information to HSI on a number of prior occasions. For example, CW-1 has provided information concerning counterfeit documents, human smuggling and other fraud schemes. As a result of information provided by CW-1, HSI has made criminal arrests, administrative arrests for immigration violations, and has also executed Federal search warrants.

said he understood the terms of the deal from CW-1 and that he would pay Soares $10,500 for Soares to clean up his name, help him get a driver's license, work permit and green card. Soares asked CI-1 if he had any type of document "that indicates that you were caught by us." If he was unable to find his documents, Soares told CI-1 that they could locate his records by fingerprinting him.

24. On a second call, the two agree that they have to trust each other. In a third call, Soares says he was sent to Washington for work and that he is going to court. He also tells CI-1 that he need not be afraid of doing the fingerprints; Soares will go with him to the FBI. "So it's nothing," Soares added. Soares claims that he was not doing anything illegal, but discusses money and trust in connection with the "cleaning" and getting CI-1 his green card. Soares also confirmed in the next call that a separate person would be doing the fingerprinting and that he charges $250. In yet another call, CI-1 said to Soares that he needed a green card and Soares asked CI-1 if CW-1 had told him (CI-1) about the "A-number." [4]

25. Soares also talked about charging $2,500 to clear deportations more than two years old in a recorded call with CI-1. He also told CI-1 that once they had his fingerprints and his record was cleared, then CI-1 would have to provide his passport, six photos and his birth certificate, just as he told CW-1. The purpose of all of this, according to Soares, as stated in a recorded phone call, is "so you're legal. When you're legal you can get your driver's license....You are going to have your green card for ten years."

---

[4] An "A-number" is an alien file number that is associated with the official government immigration file of an individual.

26. On April 2, 2014, Soares and CI-1 spoke again by telephone. They discussed that the person who was going to do the fingerprints was unable to do it unless CI-1 had his passport. During the conversation, Soares said that he was going to Massachusetts the following day "bringing six detainees who were transferred here." When CI-1 says he is concerned about who he would be giving his money to, Soares says that "this work is very dangerous" and that "we're not going to talk about these things over the telephone."

27. On April 5, 2014, I interviewed HJ, a hotel clerk at the Comfort Inn referenced in paragraph 13 above, regarding Stein. HJ stated she knew who Stein was and that Stein claimed he works for the "FBI". HJ stated the first time she met Stein was a couple of months ago. Stein told HJ that he does fingerprinting for the FBI. HJ thought her conversation about Stein's employment with FBI was around Christmas time. I showed HJ a picture of Stein and HJ positively identified the person in the picture as the customer she knew as Stein.

28. HJ stated Stein does not look professional. HJ stated she once had to go to Stein's hotel room because Stein needed new sheets for the bed and Stein had clients in the room. HJ stated the clients were Hispanic, possibly Guatemalan. HJ stated Stein always wears sweatpants and smells like cigarettes. HJ stated Stein always parks his "nice" silver car in front of the hotel and normally checks in between 6 and 7 p.m. HJ thought the number of people coming to the room was unusual. HJ also thought it was strange that Stein told her that he works for FBI and was fingerprinting individuals in a hotel room. HJ stated Stein normally had customers coming to the room within 15 to 20 minutes after he checked into the hotel.

29. On April 19, 2014, ABC informed me that Stein had checked into room 214 at the Comfort Inn. On April 19, 2014, I went hotel and subsequently obtained video from the hotel surveillance. The surveillance video shows Stein, Soares and two unknown males going to room 214. Stein is carrying a black bag. A short time later the two males leave the hotel room and a short time after that Soares leaves the hotel room carrying a manila folder.

## An Undercover Agent Meets Soares

30. On June 9, 2014 , Task Force Officer Antonio Freitas, acting in an undercover capacity, texted Soares telling him he was a friend of CI-1 and asked Soares to call him. On June 9, 2014, Soares called TFO Freitas and told him CI-1 had already given TFO Freitas' information (name and date of birth) to him. TFO Freitas told Soares that CW-1 had told him that Soares could help him with immigration problems. Soares stated he could help and that he had already started doing things but could not talk about them on the telephone. Soares asked TFO Freitas if they could meet on Saturday. TFO Freitas told Soares he would let him know. Soares stated he had to let the other person that works with him know because they have to get a hotel room. TFO Freitas asked Soares if the other person that assists Soares works for Immigration. Soares stated he is a little higher. TFO Freitas asked Soares what he meant. Soares stated his associate works for the FBI and has more power. TFO Freitas told Soares he was very nervous and asked if he was going to have problems. Soares told TFO Freitas he has been doing this for 15 years and knows the risk.

11

31. TFO Freitas asked Soares how much it was going to cost. Soares stated the total is $8,000 if you haven't been deported. Soares stated its "4" ($4,000 U.S. dollars) in the beginning, 10 months later you pay another "2" ($2,000 U.S. dollars) for the "green card" and "2" more ($2,000 U.S. dollars) when you see the judge. Soares told TFO Freitas that he would not be interviewed and would go straight to the judge (Immigration judge). Soares told TFO Freitas that he would need to provide a copy of his passport, copy of his birth certificate and four photographs. Soares told TFO Freitas to let him know by Thursday if he could do it so he could make the appointment. Soares also told TFO Freitas he would need $250 U.S. dollars to pay for the fingerprints.

## The UC Meets Stein and Is Fingerprinted

32. On June 14, 2014, TFO Freitas and CI-1 met Soares at the International House of Pancakes (IHOP) in Bourne, Massachusetts. TFO Freitas provided Soares with copies of a passport and a birth certificate created in his undercover identity. Soares drove TFO Freitas to Stein's house which is located at 6 Beacon Court, Mashpee, MA. Soares had CI-1 wait at the IHOP. While in Soares vehicle, TFO Freitas asked Soares if he works for ICE. Soares stated "I am from ICE" and said the job is very dangerous. Soares told TFO Freitas that he was a Special Agent and works all over Massachusetts. Soares explained to TFO Freitas that "we give you guys protection, for example if you were stopped by State (State Police) and were arrested, we can get you out the same day and say you are helping us with a drug, prostitution or robbery case."

33. When they arrived at 6 Beacon Court, Mashpee, MA, (Stein's address per RMV records). TFO Freitas observed that Stein had a fingerprinting machine in his garage. TFO Freitas provided Stein with his passport and $250 U.S. dollars to be

12

fingerprinted. TFO Freitas asked Stein if he worked for ICE or the FBI. Stein stated he is independent and does a lot of things. TFO Freitas asked Stein if he does a lot of fingerprinting for the FBI. Stein stated in four years he has done thousands. After Stein fingerprinted TFO Freitas, Stein filled out the fingerprint card with TFO Freitas' information including his name (a pseudonym), date of birth, height, weight, eye color and address. At the end of the meeting Stein told TFO Freitas "welcome to America." TFO Freitas got back into Soares' vehicle, while Soares continued to talk to Stein outside the vehicle. TFO Freitas saw Soares give Stein money before Soares got into his car.

### Soares Takes $4,000 from the CI

34. Soares drove TFO Freitas back to the IHOP where CI-1 was waiting. During the ride back, Soares told TFO Freitas in nine months TFO Freitas would be fingerprinted again and three months after that TFO Freitas would see the judge. Soares told TFO Freitas that he does not trust anyone else from the FBI and that "Paul" (Stein) does everything, but his specialty is fingerprinting.

35. When they arrived at the IHOP, Soares had TFO Freitas go to CI-1's parked vehicle. Soares told TFO Freitas to have CI-1 come see him. CI-1 paid Soares $4,000 U.S. dollars in government supplied funds toward obtaining his "green card" (lawful permanent resident card). SOARES told CI-1 he was going to do everything next week. Soares told CI-1 that he would call CI-1 when the results came back. The meeting ended.

36. On June 14, 2014, after the undercover meeting ended, I went with TFO Mark Shaughnessy to Soares house which is located at 92 Ridge Road, Foxborough, MA. I observed Soares' Mercedes SUV (MA Tag 94GW69) parked in the driveway of the residence. I also observed the number 92 and the name Soares on the mailbox.

13

37.    I have reviewed the Massachusetts Registry of Motor Vehicle information for Soares' Mercedes SUV.  The registered owner is Francisco J. Soares, with a date of birth of July 30, 1970 and a home address of 92 Ridge Road, Foxborough, MA.  The following information is also in the Registry record:

Make/ Model: Mercedes, ML 350

Year: 2004

Plate: Massachusetts 94GW69

VIN: 4JGAB57E94A505933.

38.    Soares uses his car to meet with potential "clients" and to transport them to various locations where Stein is set up for fingerprinting.   I know from past investigations that people engaged in illegal transactions involving paperwork, who use their personal vehicle during the criminal conduct, will often have some of the paperwork and personal notes in their vehicle at any given time.  I believe there is probable cause, therefore, that fruits and instrumentalities of the crimes described herein will be found in Soares' car.

39.   It is also common for criminals engaged in a scheme of this nature to store papers in their home.  CW-1 and TFO Freitas informed me that Soares took copies of their identifying documents such as their passport and driver's licenses.  I believe there is probable cause, therefore, that fruits and instrumentalities of the crimes described herein will be found in Soares' residence.  Soares lives at 92 Ridge Road, in Foxborough, MA.  The house is beige in color with black shutters.  The house is the last house on the left at the dead end road of 92 Ridge Road, Foxborough, MA.  The mailbox at the end of the driveway has the number 92 and the name Soares on it.  The Neponset Reservoir is

14

behind the house (to the west) and to the right side (north) of the house as you are facing the house from Ridge Road. The main door of the house is on the left side (south) of the house towards rear of the structure. The driveway is also on the left side of the house.

40. Soares has been used as a source of information by a federal agency in connection with a healthcare fraud investigation. Soares also provided information to another federal agent in another investigation. Soares was briefly investigated in the fall of 2013 on allegations that he was impersonating an immigration officer. During the course of that investigation, which was conducted by a different agent and which did not include contact with either CW-1 or CI-1, Soares was interviewed. He denied that he ever posed as a federal agent. He said he has been paid for his role in a federal healthcare fraud investigation and he acknowledged that he assisted another federal agency previously. I have spoken with the persons involved at both federal agencies, and I have conducted a search of my agency's records, regarding Soares. I am certain that he was never authorized to conduct the type of activity described herein, i.e., to hold himself out as an immigration officer and to solicit payment in exchange for "cleaning" immigration arrest histories and obtaining green cards.

41. I have no information that Stein has ever cooperated with law enforcement.

42. Stein and Soares were clearly in communication regarding the scheme to falsely impersonate a federal officer, and conspired to do the same, because they met with individuals on various occasions, as set forth above, to fingerprint the individuals as if they (Stein and Soares) were actually taking steps to improve the immigration status of the individuals. Various acts were taken to advance their conspiracy, including, but not limited to, the fingerprinting as well as the exchange of money.

15

Based upon the foregoing facts, I believe there is probable cause to believe and do believe that **FRANCISCO SOARES** and **PAUL STEIN**, knowingly, willfully and with intent to deceive, falsely represented that they were federal officers, in violation of Title 18, United States Code, Section 912, and that they conspired to falsely impersonate federal officers , in violation of Title 18, United States Code, Section 371.  I further believe that there is evidence and instrumentalities of these crimes located in Soares' vehicle and in his home, and in Stein's garage.

_____
Sean Rafferty
Special Agent
Immigration and Customs Enforcement
Homeland Security Investigations


Sworn to and subscribed before me this 21st day of July, 2014.

_____
JENNIFER C. BOAL
UNITED STATES MAGISTRATE JUDGE

16

EXHIBIT A
Premises to Be Searched

## A. Residence of Francisco Soares

92 Ridge Road, Foxborough, MA:  the house is beige in color with black shutters.  The house is the last house on the left at the dead end road of 92 Ridge Road, Foxborough, MA. The number of the house in on the mailbox at the end of the driveway. The mailbox has the number 92 and the name Soares on it. The Neponset Reservoir is directly behind house (West) and to the right side (North) of the house as you are facing the house from Ridge Road. The main door of the house is on the left side (South) of the house towards rear of the structure. The driveway is also on the left side of the house.

## B. Personal Vehicle of Francisco Soares

A 2004 Mercedes, ML 350 sports utility vehicle, vehicle identification number 4JGAB57E94A505933, plate: Massachusetts 94GW69,
registered owner: Francisco J SOARES, DOB: XX/XX/1970, address listed of 92 Ridge Road, Foxborough, MA.

## C. Garage of Paul Stein

The garage is attached to a tan, condominium style house with clapboard siding located at 6 Beacon Court, Mashpee, Massachusetts. Each residence at the condo complex has its own front door and a separate garage.  The garage is a single car garage that faces onto a driveway, which in turn faces the street (Beacon Court).  As you face the front of the residence, the garage is to the right of the front door. There is a black number 6 nailed to the white trim at the top garage door. The garage door is white in color.

17

## EXHIBIT B
### Evidence to Be Seized

**For all premises and vehicles to be searched:**

Items, documents, records, files, and other information that constitutes evidence, fruits, and/or other instrumentalities of violations of Title 18, United States Code, Section 912, including , fingerprinting supplies, fingerprint cards, money, ledgers, notes, hotel invoices, cellular telephones,  passports,  records relating to fingerprinting and/or identity, immigration documents, passports, birth certificates, law enforcement badges and credentials,  U.S. Immigration and Customs Enforcement and Federal Bureau of Investigations items to include business cards, badges, paperwork and clothing.